# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ZAVODNICK, ZAVODNICK, AND LASKY, LLC, *et al.* | : | CIVIL ACTION |
| *Plaintiffs* | : | NO. 17-4762 |
| v. | : | |
| NATIONAL LIABILITY & FIRE INSURANCE COMPANY | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                             MARCH 1, 2019

## MEMORANDUM OPINION

**INTRODUCTION**

      This is a declaratory judgment action brought pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, by Plaintiffs Zavodnick, Zavodnick, & Lasky, LLC and Todd Lasky ("Lasky") (collectively, "Plaintiffs"), as the insureds, to determine whether Defendant National Liability & Fire Insurance Company ("Defendant") has breached its obligations to defend Plaintiffs under a professional liability insurance policy issued on the basis that Plaintiffs failed to provide Defendant information required under the prior knowledge provision of the insurance application form. Before this Court are cross-motions for summary judgment filed by the parties. The issues presented in these cross-motions have been fully briefed by the parties and are ripe for disposition. For the reasons set forth, Defendant's motion is granted, and summary judgment is entered in favor of Defendant. Plaintiff's motion is denied.

**BACKGROUND**

      In their complaint, Plaintiffs seek a declaration that "Defendant is obligated to pay claim expenses and damages relating to the Underlying Action, and otherwise provide coverage under the Policy, together with post-judgment interest, attorneys' fees, expenses, costs of suit, and such

other and further relief as the Court deems just and proper under the circumstances." [ECF 1]. Procedurally, discovery ensued and concluded. Thereafter, the parties filed cross-motions for summary judgment based on the following uncontested relevant facts:[1]

### *Underlying Personal Injury Action*

In July 2013, non-party Kenneth Ayers ("Mr. Ayers"), an electrician, suffered injuries when he fell in a hole while working at a residential construction site in Pennsylvania. (Mr. Ayers Depo. at 13). Shortly thereafter, Mr. Ayers hired Delaware attorney Jeffrey Friedman ("Friedman") to pursue a worker's compensation claim (the "WC Claim") before the Industrial Accident Board of the State of Delaware (the "IAB"). (*Id.* at 16-17). As a result, Mr. Ayers commenced receiving worker's compensation benefits ("WCBs") from his worker's compensation carrier, Donegal Insurance Group ("Donegal"). (Pls' Ex. 3 at ¶ 25).

In April 2015, Mr. Ayers retained Plaintiffs and non-party Jared Kasher, Esquire ("Kasher") as counsel to represent him and his wife, Pamela Ayers ("Mrs. Ayers"), in a personal injury action based on his July 2013 accident. (Mr. Ayers Depo. at 41-42). In July 2015, Plaintiffs and Kasher filed the underlying action on the Ayers' behalf in federal court, naming as defendants the homeowner and the general contractor (hereinafter referred to as the "PI Action"). (Pls' Ex. 3 at ¶ 23). At all times during the pendency of the PI Action, Mr. Ayers was satisfied with Plaintiffs' representation. (Mr. Ayers Depo. at 48-49).

On April 14, 2016, a settlement conference was held in the PI Action, during which the defendant homeowner and defendant general contractor offered $350,000.00 as a global amount to settle the case. (Pls' Ex. 3 at ¶ 26; Mr. Ayers Depo. at 68). Plaintiffs and Kasher believed that this was a good offer for several reasons: (1) the homeowner's liability insurance policy was for $300,000; (2) there were liability concerns with regard to the general contractor; and (3) there were concerns with Mr. Ayers' comparative negligence. (Mr. Ayers Depo. at 68-69; Kasher Aff. at ¶ 7).

Lasky and Kasher informed Mr. Ayers before and during the settlement conference that Donegal could assert a subrogation lien against any settlement proceeds received from the PI Action to reclaim some or all of the money and benefits Mr. Ayers had received and could also consider the settlement proceeds as a credit against Mr. Ayers' future WCBs. (Lasky Depo. at 34-36; Kasher Aff. at ¶ 5). During the settlement conference, Lasky called non-party Alfred Myers

---

[1] These facts are derived from the parties' respective briefs and submissions. Because this Court concludes that Defendant is entitled to summary judgment, to the extent facts are disputed, such disputes are noted and, if material, construed in Plaintiffs' favor. Facts asserted by a party and supported by the record that are uncontested by the other party, whether directly or by implication, are taken to be true. *See* Fed. R. Civ. P. 56(c).

("Myers"), a Donegal claims adjuster, to propose that Donegal agree to waive the entirety of its subrogation lien for WCBs already paid and further waive any credit against Mr. Ayers' future WCBs, in exchange for a payment to Donegal equal to one third of the value of Donegal's subrogation lien for the WCBs that had already been paid up to that point. (Lasky Depo. at a 38-41).[2] Myers indicated that the proposal sounded reasonable, but that he would need to obtain internal approval. (*Id.*) The settlement conference was adjourned with the settlement offer pending. (*Id.* at 40).

Later that evening (April 14, 2016), Lasky called Friedman (Mr. Ayers' WC attorney) to inform him of the potential settlement of the PI Action, and to discuss the potential subrogation lien waiver. Friedman told him he did a great job. Lasky sought Friedman's advice regarding documentation for the lien waiver. Friedman advised him that Delaware law requires only a confirming letter. (*Id.* at 41-43, 69-70). Later that evening, Friedman sent Lasky an email, in which he confirmed their conversation; directed Lasky to Del. Code Ann. Tit. 19 § 2363;[3] advised him that the net recovery Mr. and Mrs. Ayers realized from the PI Action would, per Delaware statute, create a credit in Donegal's favor against future worker's compensation benefits; and informed him that "[i]f you have negotiated different terms directly with the workers compensation carrier [Donegal] I can not take any position on the validity or enforceability of the arrangement as I was not party to, nor involved in the settlement." (Df's Ex. F at 1390). Lasky was already aware, prior to Friedman's email, that absent an agreement by Donegal to waive its right to take a credit against the PI Action settlement on future worker's compensation benefits, § 2363 would apply, and Donegal would receive a credit against the settlement. (Lasky Depo. at 48-50).

The next day, Myers contacted Lasky and accepted Lasky's proposal on behalf of Donegal. Lasky requested that Myers send him a confirming letter to that effect. (*Id.* at 50-53). On April 18, 2016, without Lasky having received the confirmation letter from Myers, Mr. and Mrs. Ayers executed a general release of their claims in the PI Action, and Lasky informed the district court that the parties "had everything worked out." The district court later issued an order pursuant to Local Civil Rule 41 and dismissed the PI Action. (*Id.* at 54-57, 65; Kasher Aff. at ¶ 17). Under the terms of the settlement, the Ayers' net recovery of the $350,000 settlement would be approximately $153,000 (after costs and attorneys' fees and paying approximately $76,000 to Donegal to satisfy its lien). (Pls' Ex. 10 at 1).

---

[2] At the time, the value of Donegal's subrogation lien was $229,184.31. (Df's Ex. G).

[3] Section 2363 provides, as relevant: "Any recovery against the third party for damages resulting from personal injuries or death only, after deducting expenses of recovery, shall first reimburse the employer or its workers' compensation insurance carrier for any amounts paid or payable under the Workers' Compensation Act to date of recovery, and the balance shall forthwith be paid to the employee or the employee's dependents or personal representative and shall be treated as an advance payment by the employer on account of any future payment of compensation benefits . . . ." Del. Code Ann. Tit. 19 § 2363(e).

3

On that same day (April 18, 2016), Myers tried to renege on the agreement, advising Lasky that his understanding had been that Donegal would get one third of the gross settlement proceeds. (Lasky Depo. at 60-62). However, Myers subsequently told Lasky that Donegal's attorney would require him to honor the agreement, and Lasky requested a confirming fax to that effect. (*Id.* at 63). Myers sent a confirming fax the same day, which read: "This office will agree to 1/3 split of the Subrogation Lien at $76,318.37 and requests a copy of the final settlement sheet via fax." (Pls' Ex. 6). Lasky believed this language was sufficient to encompass Donegal's waiver of its right to a credit against Mr. Ayers' future compensation benefits. (Lasky Depo. at 68-69). However, Lasky believed Myers' confirming fax was vague, so on April 19, 2016, he emailed Myers a letter he felt was more encompassing, which provided:

> As we discussed yesterday final settlement sheet is not available. We expect to have that to you within the next day. This will confirm that Donegal has agreed to accept the sum of $76,278.92 in full satisfaction of the Workers' Compensation lien with respect to the third-party settlement in the amount of $350,000.00 obtained by plaintiff. We understand that the resolution of the lien is not final until we provide you with a final settlement sheet. We will forward the settlement sheet to you shortly. (Pls' Ex. 7).

On April 20, 2016, Lasky emailed Friedman a copy of the confirming fax Lasky had received from Myers. (Df's Ex. F at 1389). Friedman wrote back, "The letter is silent about any credit waiver and this letter establishes a statutory credit in the amount of any net recovery realized in the PI claim." (*Id.*). Lasky wrote back that he agreed the letter was silent as to that issue but advised Friedman that the situation had become tense because Myers had tried to back out of the deal after his supervisor reviewed it. He then expressed his disagreement with Friedman's assessment, noting, "I cant [sic] see how they can argue for a credit in the future but that will be for you to decide if and when the time comes. I am attaching the letter I sent to them so you have that as well." (*Id.* at 1388). In Friedman's reply, written an hour-and-a-half after Lasky's initial email, he stated, *inter alia*, "Your emails have been clear, that you believe no credit will exist against the future work comp claim benefits. I have been clear that I disagree." (*Id.* at 1387). Lasky wrote back, noting his hope that Friedman would advance the argument that is in Mr. Ayers' best interest, and noting that he could ask another attorney to take over the WC Claim if need be. (*Id.*).

On May 5, 2016, Donegal moved the IAB to credit Mr. Ayers' future WCBs in an amount equal to the proceeds the Ayers received from the PI Action settlement. (Pls' Ex. 9 at 5). A hearing on the motion was scheduled for May 19, 2016. (Pls' Ex. 9). In preparation for the hearing, Friedman repeatedly told Lasky that he took no position as to Donegal's alleged agreement to waive the credit, because he had not been a party to that agreement. Lasky, for his part, urged

Friedman to advance the arguments most beneficial to Mr. Ayers and consistent with the facts which Lasky had communicated to Friedman. (Df's Ex. F at 1395-1405). Unbeknownst to Lasky, Friedman conceded to Donegal's attorney that Donegal had not waived its credit but advised Donegal's attorney that he wanted to give Lasky an opportunity to state his position at the hearing. (Mr. Ayers Depo. at 109-14). Friedman told Mr. Ayers not to attend the hearing. (*Id.* at 103)

At the May 19, 2016 hearing before the IAB, Lasky testified that Myers had agreed to a lien waiver that encompassed any right to a credit against Mr. Ayers' future WCBs. Lasky conceded in his testimony that his April 19, 2016 letter did not expressly set forth Donegal's agreement to waive such a credit, but he explained that he did not include specifics in the letter because he did not want to "waive a red flag" to Myers and have Donegal "back out" of the agreement to the credit waiver. (Pls' Ex. 9 at 10-48). Myers testified at the hearing that he did not discuss with Lasky nor verbally agree to a credit waiver. (*Id.* at 56).

On May 25, 2016, the IAB granted Donegal's motion for a credit against Mr. Ayers' future WCBs in the amount of $153,638.60. (Pls' Ex. 10). In its order, the IAB explained:

> [Lasky's] explanation for not including all the terms of the settlement in this acknowledgement was essentially that he did not trust the adjuster who had tried to back out of the deal once before. Theoretically a simpler and easy to understand document would avoid another misunderstanding by the adjuster and keep him from backing out of the deal. Ironically, this lack of detail in the documentation has led to exactly the opposite. Be that as it may, there is no evidence that the carrier waived any credit or future entitlement in this document. One would expect that an attorney would draft a detailed settlement letter unambiguously setting forth all the terms of the agreement. In particular Mr. Lasky made no secret of the fact that he did not trust Mr. Myers and felt that he was lying. Logic would seem to dictate a more carefully drafted response. Judge Herlihy in the *Philips* case put this situation aptly; "The Court is compelled to note that this entire controversy, counsel, Board, and court time could have easily been avoided by better draftsmanship." The only evidence of an agreement to waive future benefits is the testimony of Mr. Lasky which in a twist of irony is seemingly contradicted by his own documentation of that agreement. (*Id.*) (citation omitted).

Lasky urged Friedman to appeal the IAB decision, opining that Mr. Ayers was "getting royally screwed and we owe it to him to take this as far as we can," but Friedman asserted that there was no basis for an appeal. (Df's Ex. F at 1423). Neither Lasky nor Kasher recall Mr. Ayers expressing dissatisfaction with their representation, becoming hostile toward them, requesting a reduction in the fees

5

they earned from the case, or threatening a lawsuit.[4] They do recall him expressing frustration with Friedman, Myers, and Donegal, and even asking Kasher if Plaintiffs could replace Friedman as Mr. Ayers' counsel in the WC Claim.[5] However, following the IAB decision, Mr. Ayers did request his file for the purpose of corresponding directly with Donegal and a regulatory insurance commission to plead his case, which he eventually did. Lasky testified that upon hearing the request:

> I said: What's up? Because any time you handle personal injury cases, any type of plaintiff's cases—if somebody ask [sic] for file materials, usually that means one of a few things. And one of the possibilities is they're switching attorneys, the other is if they're upset about something. (Lasky Depo. at 132).[6]

Months after the IAB decision, Mr. Ayers went to Kasher's office to ask his thoughts on some equipment Mr. Ayers was trying to patent. (Mr. Ayers Depo. at 140-41).

### *Professional Liability Insurance Policy*

On August 16, 2016, Plaintiffs submitted an application for professional liability insurance with Defendant. (Pls' Ex. 24). On the insurance application, Plaintiffs responded "no" to the following question:

> Is the applicant or attorney for whom coverage is sought aware of any act, error, omission, or incident that might reasonably be expected to result in a claim or suit being made against them? (*Id.* at 4).

Defendant approved the application, and the policy went into effect on October 1, 2016. (Df's Ex. A). The policy provided that the agreement for Defendant to defend or indemnify Plaintiffs would apply only if, *inter alia*:

---

[4] Mr. Ayers testified that he asked Lasky during a phone call whether he, Mr. Ayers, needed to retain an attorney to "go after" Lasky and Kasher. Mrs. Ayers testified to hearing Mr. Ayers' side of the call and recalled that it got "a little loud." Neither Mr. nor Mrs. Ayers recalled the date of the call. Mr. Ayers first guessed it was a month after the IAB decision but conceded he did not remember and that it could have been as late as December. Mrs. Ayers guessed that it could have been shortly before Christmas 2016. (Mr. Ayers Depo. at 122-28; Mrs. Ayers Depo. at 9-14). Lasky testified that this call never happened.

[5] Mr. Ayers disputes this assertion.

[6] Lasky testified in his deposition that Mr. Ayers asked him on the phone for his file. (Lasky Depo. at 131-32). However, Mr. Ayers testified that he requested his file from Kasher, and did not request his file from Plaintiffs. (Mr. Ayers Depo. at 92-94, 159-61). Regardless of from whom Mr. Ayers requested his file, it is undisputed based on Lasky's testimony that he was aware of the request and thought it could indicate that Mr. Ayers was upset about something.

> Prior to the inception of this Policy, no Insured knew or should have known that the same or related wrongful act, legal services, fact, circumstance or adverse outcome might give rise to a claim ("Prior Knowledge Provision of the Policy"). (Df's Ex. A at NLFIC000025).

*Underlying Malpractice Action*

Lasky and Kasher each received a letter dated February 27, 2017, from Bruce Cassidy, Esquire, ("Cassidy"), advising them that he represented Mr. and Mrs. Ayers in a claim for damages arising out of their representation of the Ayers in the PI Action, and requesting that they forward the letter to their respective legal malpractice carriers. (Pls' Ex. 13). Plaintiffs timely provided Defendant with the letter. (Cartier Depo. at 64). On June 20, 2017, Plaintiffs were served with a complaint in the legal malpractice action filed by the Ayers. (Pls' Ex. 19). On August 3, 2017, Defendant formally denied Plaintiffs coverage in the malpractice action based on the Prior Knowledge Provision of the Policy. (Pls' Ex. 22).

**LEGAL STANDARD**

Federal Rule of Civil Procedure ("Rule") 56 governs the practice for summary judgment motions. Fed. R. Civ. P. 56. Specifically, this rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). Under Rule 56, the court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 251–52. In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that shows an absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145–46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims and/or defenses, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. *Celotex*, 477 U.S. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant summary judgment where the non-movant's evidence is merely colorable, conclusory, or speculative. *Anderson*, 477 U.S. at 249–50. In order to defeat a motion for summary judgment, there must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. *Id.* at 252; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Further, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial. *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 (3d Cir. 1999).

The standards to be applied in deciding cross-motions for summary judgment are the same as those applied when only one party has filed a summary judgment motion; the court rules "on each party's motion on an individual and separate basis, determining, for each side, whether summary judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 403 (3d Cir. 2016) (citation and internal quotation marks omitted).

**DISCUSSION**

The issue presented herein is whether Plaintiffs were required to disclose on the insurance application form the possibility of a claim or lawsuit against them from the Ayers. Plaintiffs argue that, given the facts as Lasky knew them prior to the effective date of the policy, a reasonable attorney would not have reason to know that the Ayers might file a malpractice claim. Defendant disagrees and argues the contrary.

Under Pennsylvania law, courts apply a two-step analysis when considering a prior knowledge provision in an insurance policy. *See Selko v. Home Ins. Co.*, 139 F.3d 146, 152 (3d Cir. 1998). The first step is a subjective evaluation in which the court determines what facts the insured actually knew prior to the effective date of the policy. *Id.* The second step is an objective determination which incorporates the language of the policy at issue and asks whether a reasonable attorney equipped with the facts known to the insured would have reason to know that a claim or suit might be made against him. *See id.* ("Second, in order to determine whether the knowledge actually possessed by the insured was sufficient to create a 'basis to believe,' it must be determined that a reasonable lawyer in possession of such facts would have had a basis to believe that the insured had breached a professional duty."); *see also Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302, 306 (3d Cir. 2001) (noting that the prior knowledge provision in *Selko* differed in language from the provision before the court, and that rather than considering "whether the insured had a 'basis to believe' he had breached a professional duty," the court would consider whether the insured "could have reasonably foreseen that [his] conduct might be the basis of a claim."); *Brownstein & Washko v. Westport Ins. Corp.*, 2002 WL 1745910, at *4 (E.D. Pa. July 24, 2002). If the insured had actual knowledge of facts that might reasonably have been expected to give rise to a claim against him, the insurer may deny coverage pursuant to the prior knowledge provision.

Viewing the facts in the light most favorable to Plaintiffs, it is undisputed that Lasky knew prior to October 1, 2016, the effective date of the policy, that: as he negotiated the underlying personal injury case, Donegal (the worker's compensation carrier) would have a right under Delaware law to assert a credit against Mr. Ayers' future WCBs, unless an agreement could be reached with Donegal to waive such a right. Further, he also knew that pursuant to Del. Code Ann. Tit. 19 § 2363(e), absent such an agreement by Donegal to waive its right to a credit against Mr. Ayers' future WCBs, the credit would be applied. Myers verbally agreed to waive WCBs received by Mr. Ayers up until the time of settlement, in exchange for one-third of the value of Donegal's lien against Mr. Ayers. Though the two different types of waiver requirements were discussed with the Ayers, they signed a general release under the belief that Lasky had obtained both waivers from the carrier, specifically Donegal's waiver of the credit for future WCBs, when Lasky had yet to receive such a confirming letter from Myers. Pursuant to the settlement agreement in the underlying action, the Ayers ultimately received approximately $153,000.00, and a waiver of the subrogation of WC lien only. Mr. Ayers believed he would be eligible to continue receiving future WCBs. Lasky also knew that Myers had tried to renege on the agreement by insisting that the deal had been for one-third of the value of Mr. Ayers' gross settlement proceeds in the PI Action, and that Myers was subsequently convinced to honor the agreement. Lasky also knew that he (Lasky) was not satisfied with Myers' one-sentence confirming letter and endeavored to write his own more comprehensive confirming letter in response to protect the Ayers from the carrier's right to the credit. Lasky also knew that his confirming letter failed to address the future workers compensation benefit credit Donegal was presumed to receive under § 2363(e). Lasky drafted the letter without specificity because he did not want to "waive a red flag" to Myers and have Donegal "back out" of its agreement to waive the future credit. After the confirming letters were exchanged,

Friedman, a Delaware attorney from whom Lasky sought advice on the matter, advised him that because "[n]either letter contains any terms regarding the credit, nor a waiver of same," no credit waiver was established under Delaware law. Lasky also knew that the IAB had in May 2016 ruled in favor of Donegal and against Mr. Ayers on Donegal's entitlement to future credit and had laid the blame for Mr. Ayers losing the credit waiver squarely on Lasky's shoulders. Specifically, the IAB noted: Lasky could have cleared up any misunderstanding with a "simpler and easy to understand document"; "ironically," the lack of detail he put in the confirming letter "led to exactly the opposite"; "one would expect" an attorney's confirmation letter to unambiguously set forth all terms of the agreement; "logic would seem to dictate" that Lasky would write a comprehensive letter if his concern was, as he testified, Myers' lack of trustworthiness; the whole controversy "could have easily been avoided by better draftsmanship"; and, "in a twist of irony," the only evidence of a credit waiver was Lasky's testimony, which was contradicted by his own confirming letter. Lasky, in urging Friedman to file an appeal of the IAB decision, noted that Mr. Ayers was "getting royally screwed." Lasky also knew that Mr. Ayers had requested his file, *albeit* for a stated purpose of corresponding directly with Donegal and a regulatory insurance commission to plead his case.

Turning to the second objective step of the analysis, this Court concludes that a reasonable attorney equipped with the undisputed facts known to Lasky would have reason to know that a claim or suit might be brought against him. The written IAB decision alone would appear to dictate such a result. Although a written decision which results in financial damage to an attorney's client, which solely blames the attorney for said damage and describes the attorney's actions as ironic, illogical, in defiance of expectations, and responsible for results contrary to what he intended, *might* not be dispositive of a legal malpractice claim, it is certainly a strong indicator that the

11

attorney's actions *might give rise to a claim* for legal malpractice. The relevant caselaw strongly supports this conclusion, *i.e.*, that a prior knowledge provision may be invoked by a malpractice carrier where an adverse outcome to the insured attorney's client was based on some action or inaction by the attorney that brought about that adverse result. *See, e.g.*, *Brownstein*, 2002 WL 1745910, at *4 (ruling for the insurer based on prior knowledge provision where insured attorney was aware that his former client had sought to overturn her criminal conviction on the basis of ineffective assistance of counsel, prosecutorial misconduct, and trial court error, and had hired postconviction counsel; the insured attorney had been questioned extensively regarding his performance at a postconviction hearing; and the insured attorney knew the former client had been granted a new trial, but did not know on what ground the new trial had been granted); *Mt. Airy Ins. Co. v. Thomas*, 954 F. Supp. 1073, 1080 (W.D. Pa. 1997) (where "the defendant knew that he had not acted to prosecute his client's claim during the approximately twelve year period of its pendency and *knew that the court had dismissed the claim on that basis* . . . . [a] reasonable person . . . could expect that a malpractice claim *might* result.") (first emphasis added); *see also Baratta*, 264 F.3d at 307 n.3 ("A breach of a professional duty and a basis for a claim are thus 'two peas in a pod.' If the former occurs, experience teaches that the latter can be expected to follow.").

In support of their position, Plaintiffs make much of Lasky's subjective understanding that: the Ayers never expressed any unhappiness with Plaintiffs' services or dissatisfaction with Plaintiffs' representation; the Ayers never threatened to file suit against Plaintiffs; the Ayers never made any demands upon Plaintiffs; around the time of the IAB hearing, the Ayers requested that Plaintiffs expand the scope of their engagement to cover the WC Claim; and the Ayers only voiced frustration with Friedman, Myers, and Donegal. However, "an attorney's subjective belief, based upon his relationship with his client, that the client would not bring a malpractice suit, is irrelevant

12

to this objective analysis." *Mirarchi v. Westport Ins. Corp.*, 2003 WL 1918975, at *7 (E.D. Pa. Apr. 21, 2003); *see also Brownstein*, 2002 WL 1745910, at *5 ("[The insured's] subjective understanding of the likelihood of a future malpractice suit in light of [the client's] comments is not relevant to this inquiry); *Mt. Airy*, 954 F. Supp. at 1080 ("Any dispute over whether the [insured] believed, on the basis of his relationship with his client or his impression of that client's reaction to the situation, that the client would make a claim is not relevant to our analysis."). Accordingly, these facts supporting Lasky's subjective belief of whether or not the Ayers would bring suit are unhelpful to Plaintiffs' position.

Additionally, Plaintiffs appear to argue that Defendant cannot satisfy the objective prong because the Ayers' malpractice claim against them lacks merit, as it was Friedman, not Lasky, who committed malpractice, and because the "[t]he settlement . . . was a great result, regardless of whether Donegal maintained a credit against Ayers' future worker's compensation benefits." (ECF 22-1 at 20). However, this argument is misplaced because an attorney "cannot assume a claim will not be brought because he *subjectively* believes it . . . lacks merit." *Baratta*, 264 F.3d at 307 (emphasis original). Further, by Lasky's own account, Mr. Ayers was getting "royally screwed," an outcome the IAB placed squarely on the actions of Lasky, not Friedman. Any reasonable attorney would know that the Ayers had suffered an injury, and that the IAB had placed the blame with Lasky.[7]

Finally, Plaintiffs rely on *Bensalem Township v. Western World Ins. Co.*, 609 F. Supp. 1343 (E.D. Pa. 1985), and *Lehigh Valley Health Network v. Exec. Risk Indem. Inc.*, 2002 U.S. Dist. LEXIS 29012 (E.D. Pa. Jan 30, 2002), for support. However, *Bensalem* is inapposite, and *Lehigh*

---

[7] The Court notes Plaintiffs' assertion that Defendant's claim adjuster admitted in his deposition that Plaintiffs were truthful in answering "no" to the prior knowledge question on their application. The Court rejects this assertion as a complete mischaracterization of the deposition testimony.

is easily distinguishable. In *Bensalem*, the issue was *when* a "claim" had been made against the insured for purposes of the insured's coverage policy. The insurer did not argue, as here, that the insured failed to notify it of the potential claim, as required under a prior knowledge provision. Thus, *Bensalem* is inapposite.

By contrast, *Lehigh* involves a prior knowledge provision, but it is distinguishable on the facts. In *Lehigh*, the insured, a hospital, did not disclose on its insurance application certain issues surrounding a physician's application for staff privileges at the hospital. The physician had previously lost his "courtesy" privileges for failing to pay his staff dues, had contested that loss, and had applied for new privileges. The hospital's credentialing committee had recommended approval of his application. However, less than a month before the effective date of the insurance policy in question, the hospital's executive committee rejected his application. He was, however, still entitled to a hearing before the Board of Trustees, and ultimately requested one (though the hospital was unaware of his request until after the effective date of the insurance policy). In ruling that the insurer was required to provide the hospital coverage for the physician's federal and state court actions against the hospital for an alleged antitrust violation and for allegedly violating its own by-laws, the court held that "the situation with [the physician], as it stood in June 1995 when [the hospital] applied for coverage with [the insurer], did not yet portend litigation because [the physician] had not yet received a hearing as required by hospital by-laws." *Id.* at *29. Further, under federal law, the physician's claims "were limited to providing a fair hearing for [his] application for privileges," and "thus, [he] could not sue until the Board heard and rejected his application for staff privileges." *Id.* at *29-30. Additionally, the court noted that the credentialing process was often contentious, but rarely led to litigation, and as it pertained to the physician in question, it was not clear by the effective date of the policy that he would not receive privileges,

14

given that the credentialing committee and executive committee had decided differently on the issue, and the Board of Trustees had not yet held a hearing. Finally, the court noted that the insurer's policy did not require the hospital to notify it of disputes where outside counsel was not required, and proceedings for staff privileges generally did not require outside counsel. For myriad reasons, *Lehigh* is factually distinguishable from the facts at bar, particularly as it pertains to the written IAB decision finding Lasky at fault for the financial injury suffered by Mr. Ayers.

**CONCLUSION**

For the reasons stated herein, Defendant's motion for summary judgment is granted and Plaintiffs' motion for summary judgment is denied. Accordingly, judgment is entered in favor of Defendant. Separate Orders addressing each motion for summary judgment and consistent with this Memorandum Opinion follow.

NITZA I. QUIÑONES ALEJANDRO, U.S.D.C. J.